## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| SCOTT WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:22-cv-457 (MTT) |
| | ) | |
| GOVERNMENT EMPLOYEES | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Government Employees Insurance Company ("GEICO") moves for summary judgment on plaintiff Scott Washington's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act ("ADEA"). Doc. 15. For the reasons that follow, GEICO's motion for summary judgment (Doc. 15) is **GRANTED**.

## I. BACKGROUND[1]

Washington, a Black male, was employed by GEICO "as a Sales Representative IV in its Macon, Georgia office." Docs. 15-1 ¶ 1; 15-3 at 118:13-15; 20-1 ¶ 1; 21-1 ¶ 1. "As a Sales Representative IV, Washington was responsible for selling insurance policies to customers" over the phone, "accurately documenting sales requests, and updating policy information for customers." Docs. 15-1 ¶ 1; 20-1 ¶ 1; 21-1 ¶ 1. In 2019, Washington reported directly to supervisor Kyle Perry, who in turn reported to

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

department manager Alveno Nelson.  Docs. 15-1 ¶ 2; 15-3 at 38:3-8; 20-1 ¶ 2; 21-1 ¶ 2;
*see* Doc. 15-4 at 8.  At the end of 2019, Washington began reporting to supervisor
Kenneth Stewart, who also reported to Nelson.  Docs. 15-1 ¶ 2; 20-1 ¶ 2; 21-1 ¶ 2.
Following Nelson's retirement in March 2020, "Stewart reported to department co-
managers John Strickland and Alexander Crawford."  Docs. 15-1 ¶ 2; 15-3 at 93:1; 20-1
¶ 2; 21-1 ¶ 2.  "Sales Representatives in the Macon office handled customer calls from
two different regions: (1) the Midwest region, and (2) the Southeast region."  Docs. 15-1
¶ 3; 20-1 ¶ 3; 21-1 ¶ 3.  "Washington was primarily responsible for handling customer
calls from the Midwest region, but he would occasionally take customer calls from the
Southeast region."  Docs. 15-1 ¶ 3; 20-1 ¶ 3; 21-1 ¶ 3.

In 2019, Michael Lower worked as a Sales Supervisor in GEICO's Macon office,
"reviewing sales calls for compliance with GEICO policies and providing information to
management on the results."  Doc. 15-8 ¶ 3.  In June 2019, Lower was notified by
"sales agents from GEICO's Southeast division" that Washington made "several …
questionable … outbound sales calls to customers."[2]  Docs. 15-1 ¶ 4; 15-8 ¶ 4; 20-1 ¶
4; 21-1 ¶ 4.  Lower reviewed the cases and concluded that "Washington was changing
customers' underwriting information" without documenting the "information obtained
during the calls to support the changes."[3]  Docs. 15-1 ¶ 4; 15-8 ¶ 4; 20-1 ¶ 4; 21-1 ¶ 4.

---

[2] Washington argues that because Lower "fails to identify the sales agents who provided such information to him" this statement contains inadmissible hearsay that should not be considered on summary judgment.  Doc. 20-1 ¶ 4.  But GEICO does not offer the statement to prove the truth of the matter asserted.  Doc. 21-1 ¶ 4.  Rather, GEICO offers the statement to "show the effect on the listener."  *Id*. Thus, the statement is admissible to explain why Lower reviewed Washington's calls.  *See, e.g.*, *United States v. Rivera*, 780 F.3d 1084, 1093 (11th Cir. 2015).

[3] Washington concedes that he "changed customers' underwriting information without documenting the information obtained during the calls to support the changes," but disputes "the extent of what was changed," "what information may not have been documented," and any suggestion "that this conduct was improper."  Doc. 20-1 ¶ 4.

"On June 17, 2019, Lower referred the questionable cases to Nelson for further investigation.  Nelson reviewed the cases with Washington [and] Washington claimed that he changed underwriting information at customers' request."   Docs. 15-1 ¶ 5; 15-8 ¶ 5; 20-1 ¶ 5; 21-1 ¶ 5.  In a written statement, Washington explained that in "most of [his] cases" he documented the changes in "jury," GEICO's call notation software, but "on some cases [he] may have updated jury but did not select the update button" to save the changes with the appropriate time stamp.  Doc. 15-4 at 6; *see also* Doc. 15-3 at 71:9-12.  "Nelson instructed Washington that he was required to document information obtained during customer calls to support underwriting changes" and "advised Washington that 100% of his calls would be monitored to ensure he was properly handling calls and documenting information to support underwriting changes." Docs. 15-1 ¶ 6; 20-1 ¶ 6; 21-1 ¶ 6.

On November 11, 2019, Nelson discussed another "policy concern" with Washington.  Docs. 15-1 ¶ 7; 15-6 at 2; 20-1 ¶ 7; 21-1 ¶ 7.  Washington could not recall the specifics of the "policy concern" but believed that the issue was referred to Nelson by Lower.  *See* Docs. 15-3 at 84:2-14; 15-4 at 4.  As a result, on November 17, 2019, Washington filed a complaint against Lower claiming: he was "being singled out, targeted, racially harassed, and put in a hostile work environment"; that co-worker Daquia Miller told him that Lower was investigating his policies and listening to his calls; and that co-worker Chad Hickman told him Lower said he "was going to have Washington's 'black ass fired.'"[4]  Docs. 15-1 ¶ 8; 15-3 at 77:12-17; 15-4 at 3-4; 20-1 ¶ 8; 21-1 ¶ 8.  Finally, Washington claimed that Lower's call monitoring was inappropriate

---

[4] GEICO objects to this statement as inadmissible double hearsay.  Doc. 21-1 ¶ 9.  For the reasons discussed below, that objection is sustained.

because Washington worked in the Midwest division and he did not report to Lower, who worked in the Southeast division.  Docs. 15-3 at 63 at 14-20; 15-4 at 4.

On November 18, 2019, Lorene Adams, a Senior Human Resources Compliance Specialist, and Nelson met with Washington to discuss his complaint against Lower and additional cases where Washington changed underwriting information without appropriate documentation.   Docs. 15-1 ¶ 10; 15-6 at 2; 20-1 ¶ 10; 21-1 ¶ 10. According to Adams's notes of the conversation: Washington acknowledged that underwriting information was changed but insisted that the changes were "only done at the request of the customer," Nelson and another HR representative "had looked into this previously and there was not any wrongdoing by" Washington, and Washington reiterated that he wanted Lower to "stop randomly reviewing" his calls.  Doc. 15-6 at 2. According to Washington, Adams also stated that Lower was "not supposed to" monitor his calls and she "assure[d]" Washington that Lower would "no longer be monitoring" his calls.  Doc. 15-3 at 65:14-19, 65:25-66:4.

"On November 20, 2019, Adams met with Lower who acknowledged reviewing [Washington's] calls" for two reasons:

> A couple of [Southeast] Sales Agents had brought questionable cases to his attention and as he was reviewing those particular cases, he agreed with the agents' assessment of the calls.  Since he had previously referred cases to [Nelson] about these same issues (changing underwriting info), he decided to look at a few more of [Washington's] cases.  When he did, he identified two more recent cases where [Washington] changed underwriting information.

Docs.  20-1 ¶ 10; 15-6 at 2-3; 21-1 ¶ 10.  After speaking with Lower, Adams concluded that at least one of the calls was "questionable."  Doc. 15-6 at 3.  As a result, on November 26, 2019, Adams and Nelson again met with Washington to review the two recent calls Lower had monitored.  *Id*.  During the meeting, Washington's "only

explanation" for changing underwriting information was "because the customer gave information to support the change."  *Id*.  Nelson reiterated that "underwriting information changes" must include proper "documentation."  *Id*.  On November 26, 2019, Washington provided a statement to Adams "apologiz[ing]" for not documenting information obtained during calls and promising to "make sure that [he] document[ed] all calls" appropriately in the future.  Doc. 15-4 at 7.

Adams emailed Nelson a summary of Washington's "call handling" from June to November 2019.  Doc. 15-6 at 2-3.  Adams concluded that:

> There have been several questionable cases that were sold during outbound calls and these calls have not been recorded; therefore, there are not any facts to support that the customers have not requested or provided additional information to support the changes in the underwriting. While the percent of questionable cases are small in comparison to the number of calls [Washington] take[s], it is questionable on why this type of underwriting information is changing.

*Id*. at 3.  Additionally, Adams concluded that Washington's allegation that Lower stated he would get Washington fired was meritless.[5]  Docs. 15-1 ¶ 9; 15-3 at 65:20-25; 20-1 ¶ 9; 21-1 ¶ 9.

On or about December 10, 2019, in accordance with GEICO's disciplinary policy, Perry issued Washington a memorandum for "improper call handling."[6]  Doc. 15-4 at 8. "In general, GEICO follows the following disciplinary steps for violations of its policies: a memorandum, a written warning, and termination."  Docs. 15-1 ¶ 12; 20-1 ¶ 12; 21-1 ¶ 12.  The memorandum addressed two cases where Perry concluded that Washington

---

[5] Lower testified by declaration that he "never stated that [he] was going to have Washington's 'black ass fired.'"  Doc. 15-8 ¶ 6.  Washington's attorney did not depose Lower.  *See* footnote 16.

[6] The memorandum is dated December 9, 2019, but references a call that occurred on December 10, 2019.  Doc. 15-4 at 8.

altered customers' underwriting information without documenting why the changes were made.  Doc. 15-4 at 8.  "Washington was again instructed to document changes made to policies during calls, and he was advised that additional instances could result in further disciplinary action, including a warning."  Docs. 15-1 ¶ 12; 20-1 ¶ 12; 21-1 ¶ 12. Washington testified in his deposition that he reviewed the problematic calls with Perry and, while he did not agree with Perry's assessment of what happened, he signed the memorandum to "move forward."  Doc. 15-3 at 94:11-95:6.

On December 22, 2019, Perry issued Washington a second memorandum for "improper call handling" after a customer complained that Washington made unauthorized changes to underwriting information.  Docs. 15-1 ¶ 13; 15-4 at 9; 20-1 ¶ 13; 21-1 ¶ 13.  The memorandum again counseled Washington to "make clear documentation as to any changes that occur on [a] call with a detailed description of why the changes are being made."  Doc. 15-4 at 9.  Washington agreed that the misconduct outlined in the memorandum was accurate.  Doc. 15-3 at 97:24-98:3.

Despite repeated counseling on proper call handling procedure, "Washington failed to comply with the expectations set forth in the memoranda."  Docs. 15-1 ¶ 14; 20-1 ¶ 14; 21-1 ¶ 14; *see also* Doc. 15-3 at 92:7-11 ("Q: And did you comply with this memo?  A: No, 'cause like a month later, or two months later, or three months later, I was back in my director's office now under some type of administrative action.").  On March 10, 2020, Senior Director of Customer Service Chelsea Ibarra discussed with Washington several cases where Washington failed to properly document underwriting criteria.[7]  Docs. 15-1 ¶ 14; 20-1 ¶ 14; 21-1 ¶ 14.  In a written statement following the

---

[7] Washington's attorney, in his response to GEICO's statement of undisputed facts, disputes that the March 10, 2020 incident is evidence that he failed to comply with the December 2019 memoranda

March 10, 2020 meeting, Washington acknowledged that he made several "mistakes." Doc. 15-4 at 13.  However, he claimed that "he was being retaliated against for the November 2019 complaint against Lower."  Docs. 15-1 ¶ 14; 15-4 at 13; 20-1 ¶ 14; 21-1 ¶ 14.  Washington also testified that Nelson told him Lower was continuing to monitor his calls and was the reason his supervisors were taking "administrative action[]" against him.  Doc. 15-3 at 93:6-12, 122:4-17.

On May 5, 2020, Crawford issued Washington a written warning for "improper call handling" based on Washington's failure to properly document changes to underwriting criteria on December 10, 2019 and March 10, 2020.  Docs. 15-1 ¶ 15; 15-4 at 10; 20-1 ¶ 15; 21-1 ¶ 15.  Specifically, the warning stated:

> On December 10, 2019, during a review of recorded calls you were observed changing underwriting criteria that could affect the rate of the policy.  A record of [the] conversation was completed with you confirming your understanding of the expectations of you by informing your supervisor when making outbound calls and following the guidelines for call handling on those calls.  On March 10, 2020, during another review of calls, you displayed the same behavior where you made outbound calls and changed some underwriting criteria. This behavior is in violation of the GEICO Code of Conduct.

Docs. 15-1 ¶ 15; 15-4 at 10; 20-1 ¶ 15; 21-1 ¶ 15.  Crawford testified by declaration that "Lower was not involved in, and did not influence, [his] decision to issue Washington the written warning."  Doc. 15-14 ¶ 9.

---

because Washington's March 10, 2020 statement "reflect[s] that there were several errors made in the documentation, not that [he] failed to document changes entirely."  Doc. 20-1 ¶ 14.  The December 2019 memoranda instructed Washington to "make clear documentation as to any changes that occur on [a] call with a detailed description of why the changes are being made" and to "make documentation on any changes that occur on outcalls."  Doc. 15-4 at 8-9.  Clearly, implicit in GEICO's instruction to document underwriting changes was GEICO's direction to *accurately* document those changes.  Thus, the March 10, 2020 incident is evidence that Washington—as he acknowledged in his deposition—failed to comply with the December 2019 memoranda.  *See* Doc. 15-3 at 92:7-11.

According to GEICO, the two memoranda and the warning did not have the desired effect.  "In late 2020, GEICO received multiple customer complaints about insurance policies being started in their names without permission and without payment."[8]  Docs. 15-1 ¶ 16; 15-14 ¶ 4; 20-1 ¶ 16; 21-1 ¶ 16.  As a result, "GEICO conducted a department-wide audit to identify all policies sold without payment since September 20, 2020.  The audit showed that, from September 20, 2020 through January 12, 2021, Washington bound 99 policies without payment."  Docs. 15-1 ¶ 16; 15-14 ¶ 7; 20-1 ¶ 16; 21-1 ¶ 16.  The practice of "binding customers to policies without permission and without payment" would make it appear that "Washington was selling more policies than were sold, resulting in Washington receiving higher monthly Power Selling Ratio [] scores and bonus opportunities."  Docs. 15-1 ¶ 20; 15-14 ¶ 5; 20-1 ¶ 20; 21-1 ¶ 10.

"On January 12, 2021, Strickland, Crawford, and Stewart met with Washington to discuss the results of the department-wide audit."  Docs. 15-1 ¶ 17; 20-1 ¶ 17; 21-1 ¶ 17.  "Following the meeting, Washington provided a statement to Crawford, claiming that system issues caused payments not to post," and, thus, the failure to bind policies without payment was not the result of "intentional conduct."  Docs. 15-1 ¶¶ 18-19; 15-4 at 11; 20-1 ¶¶ 18-19; 21-1 ¶¶ 18-19.  Additionally, Washington claimed that these allegations of misconduct were "clearly ongoing retaliations from [his] complaints" of

---

[8] Washington objects to this statement because Crawford fails to identify the customers who purportedly made complaints.  Doc. 20-1 ¶ 16.  The names of the customers are not material and, thus, Washington's objection is overruled.  *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248) ("A fact is material for the purposes of summary judgment only if it 'might affect the outcome of the suit under the governing law.'").

"harassment going on the last two years with SE management"—i.e., Lower.  Doc. 15-4 at 11.

However, "[t]he audit revealed that Washington was a clear outlier in the department and that he exhibited a pattern of selling policies without payment while he was signed out of the phone system."  Docs. 15-1 ¶ 19; 15-14 ¶ 8; 20-1 ¶ 19; 21-1 ¶ 19. As a result, Crawford did not believe that Washington's conduct was unintentional:

> John Strickland and I met with Scott Washington yesterday, 1/12.  We reviewed the information attached above, that shows he has bound 99 policies since 9/14 without any payment.  Further, we reviewed how he was signed out on "break" or "end duty" while most of these policies were bound.  Lastly, we played an example from the call clips listed below.  The first is our customer clearly stating they don't want a GEICO policy – the second clip is that same customer calling back asking why it was started without her permission.
>
> …
>
> In his statement, Scott expressed that this was targeting from the "former SE" side. However, this information was found in a full/general department audit.  We gave him the opportunity to explain what had happened with specific examples – but he referred that it must be IT or Jabber issues. **The quantity and proof of him being signed out would say otherwise**.

Doc. 15-15 at 2 (emphasis added).

Because "Washington's actions violated GEICO's Code of Conduct and the terms of Washington's May 5, 2020 written warning," Crawford "made the decision to terminate Washington's employment."  Doc. 15-14 ¶ 8; *see also* Doc. 15-7 at 2. Crawford testified by declaration that "Lower was not involved in, and did not influence, [his] decision to … terminate Washington's employment."  Doc. 15-14 ¶ 9.  Similarly, Lower testified by declaration that he "was not involved in" and did not "attempt to influence, the decisions to issue … the December 9 and 22, 2019 memoranda or the May 5, 2020 written warning, or to terminate Washington's employment."  Doc. 15-8 ¶ 7.

"On February 4, 2021, Crawford and Strickland notified Washington of his termination."  Docs. 15-1 ¶ 21; 20-1 ¶ 21; 21-1 ¶ 21.  Washington filed a charge of discrimination with the Equal Employment Opportunity Commission on August 3, 2021.  Docs. 1 ¶ 65; 15 at 9; 20 at 11-12.  On December 27, 2022, Washington filed a complaint against GEICO alleging discrimination under Title VII, § 1981, and the ADEA and retaliation under Title VII and the ADEA based on his termination.[9]  Doc. 1 ¶¶ 69-110.  GEICO moves for summary judgment.[10]  Doc. 15.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson*, 477 U.S. at 248.  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including

---

[9] Washington's complaint also alleges that a variety of other actions, including GEICO's investigation into his alleged misconduct, the December 2019 memoranda, and May 2020 warning, were discriminatory and/or retaliatory.  *See generally* Doc. 1.  Washington's response brief clarifies that his discrimination and retaliation claims are based only on his February 4, 2021 termination.  Doc. 20 at 12.

[10] Washington's response brief abandons his ADEA claims.  Doc. 20 at 1.  Washington's attorney has a practice of filing a "broadside" of claims and abandoning many of those claims only after a summary judgment motion has been filed.  *E.g., Scott v. Macon-Bibb Cnty. Ga.,* No. 5:21-cv-239-MTT (M.D. Ga. Mar. 26, 2024); *Gray v. Bd. of Trs. of Ga. Mili. Coll.*, 2023 WL 5959428, at *3 n.2, *4 (M.D. Ga. Mar. 7, 2022); *Helton v. Geo. D. Warthen Bank*, 2023 WL 2266136, at *15 n.14 (M.D. Ga. Feb. 28, 2023); *Richardson v. Macon-Bibb Cnty.*, 2022 WL 2318501, at *5-6 (M.D. Ga. June 28, 2022); *Richardson v. Davis*, 2022 WL 2532167, at *2, *3 n.8 (M.D. Ga. July 7, 2022).

Despite previous warning by the Court, Washington's attorney persists with this practice.  *Lloyd v. Twin Cedars Youth & Fam. Servs., Inc.*, 2024 WL 247066, at *2 n.1 (M.D. Ga. Jan. 23, 2024).

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

### A. Title VII and § 1981 Discrimination Claims

Washington brings race-based discrimination claims under Title VII and § 1981 based on GEICO's decision to terminate his employment on February 4, 2021.  Doc. 1 ¶¶ 69-85.  Employment discrimination claims under Title VII and § 1981 "are subject to the same standards of proof and use the same analytical framework."[11]  *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018); *see also Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020); *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 n.5 (11th Cir. 2023).

To succeed in a discrimination claim, an employee must present either direct or circumstantial evidence of discriminatory intent.  "Direct evidence is 'evidence, which if believed, proves existence of a fact in issue without inference or presumption.'"  *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017).  In the absence of direct evidence, a plaintiff can rely on either the *McDonnell Douglas* burden-shifting framework or present a convincing mosaic of circumstantial evidence sufficient to create a triable issue of fact as to whether the defendant acted with discriminatory intent. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Berry v. Crestwood*

---

[11] However, the causation standards may differ.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020); *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 657 (2020); *Hornsby-Culpepper*, 906 F.3d at 1312 n.6; *Phillips*, 87 F.4th at 1321 n.5.

*Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023).  Regardless of the specific framework, the question ultimately is "whether the evidence permits a reasonable factfinder to find that the employer [discriminated] against the employee."  *Berry*, 84 F.4th at 1311.  Washington relies on circumstantial evidence to prove discriminatory intent.[12]  Doc. 20.

### 1. *McDonnell Douglas*

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination.  411 U.S. at 802.  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981).  This burden of production means the employer "need not persuade the court that it was actually motivated by the proffered reasons," but must produce evidence sufficient to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff."  *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff must then show that the employer's stated reason is in fact pretext for discrimination.  *Kragor*, 702 F.3d at 1308.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id*. at 1308 (emphasis added) (quoting *Burdine*, 450 U.S. at 256). Ultimately,

---

[12] Perhaps because he recognizes that Lower's alleged statement to Hickman that he "was going to have Washington's 'black ass fired'" is inadmissible, Washington does not argue that he has direct evidence of discrimination.  *See* Docs. 15-1 ¶ 8; 20-1 ¶ 8; 21-1 ¶ 8.  He does invoke the alleged statement to demonstrate a convincing mosaic of circumstantial evidence of discrimination.

the burden of persuasion rests with the plaintiff who must show that the proffered reasons for the employment action were pretextual— thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of impermissible discrimination.

To establish a prima facie case of discrimination, a plaintiff must show "(1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis v. City of Union City, Ga. (Lewis I)*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). It is undisputed that Washington is a member of a protected class, suffered an adverse action, and was qualified to perform his job. Docs. 15 at 11; 21 at 2. GEICO argues that Washington's discrimination claims fail because he cannot identify a similarly situated comparator and he cannot demonstrate that its reasons for terminating his employment were pretextual. Doc. 15 at 14.

Washington contends he has identified "at least one comparator," Lynette Ringe. Doc. 20 at 4. A valid comparator must be someone "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1226. Washington need not prove "that [he] and [his] comparators are identical save for their" protected trait. *Id*. at 1227. Rather, he can show the similarly situated individual (1) "engaged in the same basic conduct (or misconduct)," (2) was "subject to the same employment policy, guideline, or rule," (3) was "under the jurisdiction of the same supervisor," and (4) "share[s] the plaintiff's employment or disciplinary history." *Id*. at 1227-28.

Ringe is not a similarly situated comparator.  First, other than the bare assertion in his response brief that Ringe is white, Washington offers no evidence of Ringe's race—likely because Ringe was named as a comparator for Washington's abandoned age discrimination claims, not his race discrimination claims.  *Bryant v. U.S. Steel Corp.*, 428 F. App'x 895, 897 (11th Cir. 2011) (holding an attorney's argument in a brief "is not evidence"); Doc. 15-3 at 139:7-21.  Second, Washington worked under a different supervisor than Ringe—Washington was Ringe's supervisor.  Doc. 15-3 at 132:9. Finally, Ringe engaged in different misconduct and did not share the same disciplinary history.  Ringe allegedly paid for a customer's insurance policy out of her own pocket *one time*; Washington was repeatedly reprimanded for making undocumented changes to policy information and bound 99 policies without payment.  Docs. 15-1 ¶¶ 12-15, 17, 19; 15-3 at 132:10-14; 20-1 ¶¶ 12-15, 17, 19; 21-1 ¶¶ 12-15, 17, 19.

In sum, Washington has not identified an appropriate comparator and, thus, fails to adduce admissible evidence supporting a prima facie case of race discrimination. But even if Washington had established a prima facie case, GEICO argues it still is entitled to summary judgment because it had legitimate, nondiscriminatory reasons for terminating Washington—his serial violations of GEICO's call handling policies.  Doc. 15 at 11.  Washington does not argue that GEICO's legitimate, nondiscriminatory reasons are pretextual.  *See* Doc. 20.  Nevertheless, the Court will address whether Washington has sufficient evidence to demonstrate pretext.

On December 10, 2019 and December 22, 2019, Perry issued Washington two memoranda for "improper call handling."  Docs. 15-1 ¶¶ 12-13; 20-1 ¶¶ 12-13; 21-1 ¶¶ 12-13.  Then on March 10, 2020, Ibarra discussed several cases with Washington

where he failed to properly document underwriting criteria and "failed to comply with the expectations set forth in the memoranda."  Docs. 15-1 ¶ 14; 20-1 ¶ 14; 21-1 ¶ 14.  As a result, on May 5, 2020, Crawford issued Washington a written warning based on Washington's failure to properly document changes to underwriting criteria on December 10, 2019 and March 10, 2020.  Docs. 15-1 ¶ 15; 20-1 ¶ 15; 21-1 ¶ 15.  Then in January 2021, a department-wide audit revealed that Washington bound 99 policies without payment.  Docs. 15-1 ¶¶ 16, 19; 20-1 ¶¶ 16, 19; 21-1 ¶¶ 16, 19.  This practice made it appear that "Washington was selling more policies than were sold, resulting in Washington receiving higher monthly Power Selling Ratio [] scores and bonus opportunities."  Docs. 15-1 ¶ 20; 15-14 ¶ 5; 20-1 ¶ 20; 21-1 ¶ 10.  Because "Washington's actions violated GEICO's Code of Conduct and the terms of Washington's May 5, 2020 written warning," Crawford "made the decision to terminate Washington's employment."  Doc. 15-14 ¶ 8.

Washington does not dispute the *facts* underlying his alleged misconduct.  Docs. 15-1 ¶¶ 12-15, 17, 19; 15-3 at 94:11-95:6, 97:24-98:3; 20-1 ¶¶ 12-15, 17, 19; 21-1 ¶¶ 12-15, 17, 19.  Rather, Washington tries to explain *why* he violated GEICO's policies. *See, e.g.*, Doc. 15-4 at 11 (explaining his failure to bind policies without payment was the result of "system issues" and not intentional misconduct), 13 (explaining the "mistake[s]" resulting in the March 20, 2020 warning were the result of working "in a fast pace environment").  But "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010); *see Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)

(noting that the pretext inquiry is "limited to whether [the employer] *believed* that [the employee] was guilty of [misconduct]" and whether the employee actually engaged in misconduct is irrelevant).

Here, Washington's managers consistently reported that they were dissatisfied with Washington's call handling.  Washington's contrary opinion is immaterial.  Importantly, Washington does not offer evidence that their beliefs were not genuinely held.  *See Champ v. Calhoun Cnty. Emergency Mgmt. Agency*, 226 F. App'x 908, 916 (11th Cir. 2007) ("[I]t is insufficient to merely dispute whether an incident occurred without presenting evidence that the decision-maker's belief that those incidents occurred was unworthy of credence.") (citing *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005)).  Thus, Washington has not demonstrated that the December 2019 memoranda, May 2020 warning, and January 2021 audit were merely a "cover" for discrimination, and it is not the Court's role to "sit as a 'super-personnel department,' and … second-guess the wisdom of an employer's business decisions." *Alvarez*, 610 F.3d at 1266.  Accordingly, Washington fails to successfully navigate the *McDonnell Douglas* framework.

*2. Convincing mosaic*

The Court recognizes that "the *McDonnell Douglas* framework 'is not the exclusive means' by which an employee can prove discrimination with circumstantial evidence."  *Berry*, 84 F.4th at 1316 (quoting *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)).  Thus, Washington can avoid summary judgment by presenting "a convincing mosaic of circumstantial evidence that raises a reasonable inference of [discrimination]."  *Berry*, 84 F.4th at 1311.  "A plaintiff may establish a

convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis v. City of Union City, Ga. (Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Washington's convincing mosaic argument, oddly enough, relies on a "cat's paw" theory.[13]  Doc. 20 at 6-11.  Specifically, Washington claims that Crawford made the decision to terminate him based on Lower's biased recommendation.  *Id*.  Under the "cat's paw" theory, the animus of a non-decision-making employee can be imputed to a neutral decisionmaker if that decisionmaker followed the biased recommendation of the non-decision-making employee without conducting an independent investigation.  *See Staub v. Proctor Hospital*, 562 U.S. 411 (2011).  In other words, a non-decision-making employee uses "the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the [non-decision-making employee's] discriminatory animus."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).  Washington's cat's paw argument fails for two reasons.  First, Washington has no admissible evidence that Lower was motivated by discriminatory animus.  Second, even if Lower was motivated by discriminatory animus, GEICO independently investigated the allegations of misconduct against Washington before deciding to terminate his employment.

---

[13] Odd, because if Washington had admissible evidence of a supervisor's discriminatory animus, he logically would invoke a cat's paw theory to establish a direct evidence case rather than a circumstantial evidence case.  *See supra* note 12.

Washington contends that Lower's discriminatory animus is apparent from Lower's alleged statement that he "was going to have Washington's 'black ass fired'" and that Lower "subjected several other black male employees to similar treatment as Washington."  Docs. 15-1 ¶ 8; 20 at 6, 10; 20-1 ¶ 8; 21-1 ¶ 8.  GEICO objected[14] to both contentions on hearsay grounds.

"The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'"  *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir.1999) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden falls on the party offering the evidence to show that the statement satisfies the requirements for any hearsay exception or exclusion.  *United States v. Kennard*, 472 F.3d 851, 856 (11th Cir. 2006).  Washington's attorney makes no effort to explain how the statements are admissible.  *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2006) ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention.").

In any event, Washington's claim that Hickman said Lower said something is double hearsay, which is admissible only if each part of the combined statements conforms with an exception to the hearsay rule.  Fed. R. Evid. 805.  Federal Rule of Evidence 801(d)(2)(D) provides that a statement is not hearsay if "[t]he statement is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Generally, the

---

[14] "The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

statement of a non-decisionmaker can be admissible "as within the scope of" the employment relationship under Rule 801(d)(2)(D) if the employee had "some kind of participation in the employment decision or policy of the employer." *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1209 (11th Cir. 2013) (quoting *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)).

The Court assumes that because Lower was a supervisor, his statement could be admissible as a statement of a party opponent's employee. Hickman, on the other hand, was a fellow Midwest sales agent—he was not involved in the decision to terminate Washington or investigate his call handling. *See* Doc. 15-3 at 58:6, 60:11-12. He is, as far as the record shows, a random GEICO employee who Washington claims passed along Lower's alleged statement. Thus, Hickman's statement is not admissible "as within the scope of" the employment relationship because he did not have any supervisory authority over Washington or participate in the employment decision. *Calvert v. Doe*, 648 F. App'x 925, 928 (11th Cir. 2016). "So, to the extent that the first layer of hearsay could come under the Rule 801(d)(2) exception,"—i.e., Lower's statement to Hickman—"there is no exception to cover the second layer"—i.e., Hickman's statement to Washington. *Suggs v. Sam's E., Inc.*, 2020 WL 1640181, at *3 (N.D. Ala. Apr. 2, 2020).[15]

Assuming Hickman in fact told Washington that he heard Lower say that he "was going to have Washington's 'black ass fired,'" Washington's course was obvious—get a

---

[15] An employee's statement about the employer's decision-making process could also be admissible "as an admission by a party opponent" if the employee was repeating a statement from the decisionmakers *and* the employee's statement is independently admissible. *Kidd,* 731 F.3d at 1208 n.15. But again, even if Lower's statement to Hickman was admissible under this exception, Washington has not pointed to an independent basis for admitting Hickman's statement to him.

declaration from or depose Hickman.  *See* Docs. 15-1 ¶ 8; 20-1 ¶ 8; 21-1 ¶ 8.  Yet, Washington's attorney did no discovery and there is no admissible evidence of Hickman's hearsay statement.[16]

Next, Washington contends that Lower discriminated against two other black sales agents, Dendrick King and Desmond, by monitoring their calls, sending feedback to their supervisor, and ultimately causing their terminations.  Doc. 20 at 6-7.  First, this argument too is based on inadmissible hearsay:  Washington testified that he "learned" that Desmond was being monitored by Lower through the "rumor mill" and Washington testified that he was informed by King's supervisor, Pam, that Lower was monitoring King's calls.  Doc. 15-3 at 79:10-16, 80:25-81:4.  Washington's testimony about Desmond is clearly hearsay.  Washington's testimony about King is potentially admissible under Rule 801(d)(2)(D)—although Washington's attorney makes no effort to explain how this statement would fall under a hearsay exception.  But regardless of whether this argument is supported by admissible evidence, Washington does not know why these individuals were terminated and whether Desmond and King engaged in the misconduct of which they were accused.  *Id*. at 82:20-83:9.  Notably, Lower was responsible for "reviewing sales calls for compliance with GEICO policies and providing information to management on the results."  Doc. 15-8 ¶ 3.  Thus, even if Lower was monitoring King's and Desmond's calls, there is no evidence to suggest that this call monitoring was prompted by discriminatory animus, rather than his normal job duties.

---

[16] Washington's attorney seems to have an aversion to conducting discovery.  *See, e.g., Loyd v. Twin Cedars Youth and Family Serv., Inc.*, No. 5:22-cv-195-MTT (M.D. Ga. May 26, 2022); *Gordon v. Bibb Cnty. Sch. Dist.*, No. 5:21-cv-143-TES (M.D. Ga. Apr. 23, 2021); *Assad v. Air Logistics and Eng'g Sols., LLC*, No. 5:20-cv-135-TES (M.D. Ga. Apr. 8, 2020); *Johnson v. Cirrus Educ. Grp., Inc.*, No. 5:20-cv-256-MTT (M.D. Ga. July 1, 2020); *Scott v. Macon-Bibb Cnty. Ga.*, No. 5:21-cv-239-MTT (M.D. Ga. Mar. 26, 2024); *Kendrick v. Talton et al*, No. 5:22-cv-381 (M.D. Ga. Oct. 27, 2022).

In any event, even if Washington had evidence of a co-worker's discriminatory animus, the allegations of misconduct leading to Washington's termination were independently investigated, severing any alleged causal connection between Lower's alleged biased recommendation and Washington's termination. *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023) (emphasis added) ("A cat's-paw argument requires evidence that the ultimate (and manipulated) decisionmaker—the puppet—'followed the biased recommendation' of another—the puppeteer—'*without independently investigating* the complaint against the employee.'") (quoting *Stimpson*, 186 F.3d at 1332); *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1021 (11th Cir. 2023); *Johnson*, 948 F.3d at 1329.

Here, Crawford testified that he made the decision to terminate Washington's employment based on the findings of the January 2021 audit, which "violated GEICO's Code of Conduct and the terms of [the] May 5, 2020 written warning." Doc. 15-14 ¶ 8. Before concluding that Washington bound 99 policies without payment, Crawford discussed the allegations with Washington. Docs. 15-1 ¶¶ 17-19; 15-4 at 11; 20-1 ¶¶ 17-19; 21-1 ¶¶ 17-19. Washington claimed that "system issues caused payments not to post," and the failure to bind policies with payment was not the result of "intentional conduct." Docs. 15-1 ¶¶ 18-19; 15-4 at 11; 20-1 ¶¶ 18-19; 21-1 ¶¶ 18-19. After hearing Washington's side of the story, Crawford simply did not believe that Washington's conduct was unintentional. Doc. 15-15 at 2 ("We gave [Washington] the opportunity to explain what had happened with specific examples – but he referred that it must be IT or Jabber issues. The quantity and proof of him being signed out would say otherwise."); *see also* Docs. 15-1 ¶ 19; 15-14 ¶ 8; 20-1 ¶ 19; 21-1 ¶ 19. As a result,

Crawford independently investigated the allegations underlying the January 2021 audit. *Johnson*, 948 F.3d at 1329 ("[The plaintiff's] argument would fail because [the decisionmaker] considered both [the plaintiff's] and [the alleged biased recommender's] versions of the events."). The fact that Washington disagrees with Crawford's conclusion is insufficient to demonstrate that Crawford merely ratified Lower's alleged discriminatory animus.

The allegations underlying the May 5, 2020 warning were also independently investigated. Specifically, the May 5, 2020 warning was based on Washington's failure to comply with GEICO's call handling policies on December 10, 2019 and March 10, 2020. Doc. 15-4 at 10. Washington discussed the December 10, 2019 incident with Perry before Perry issued the December 10, 2019 memorandum. Doc. 15-3 at 94:11-95:6. And Washington discussed the March 10, 2020 incident with Ibarra before Ibarra concluded that Washington violated GEICO's call handling policies. Doc. 15-4 at 12-14. In short, both Perry and Ibarra heard Washington's side of the story before concluding that Washington violated GEICO's call handling policies. *Johnson*, 948 F.3d at 1329; *Harris,* 82 F.4th at 1301 (holding that the plaintiff's cat's paw theory failed because the decisionmaker "relied on, if anything, the recommendation[s] of someone *other* than" the biased recommender) (emphasis added).

In sum, the undisputed evidence demonstrates that the May 2020 warning and January 2021 audit were independently investigated, and Washington has no evidence to support his contention that Crawford merely rubber-stamped Lower's alleged discriminatory motive. Moreover, Washington's discrimination claims fail because he has not, as discussed, established that GEICO's legitimate nondiscriminatory reasons

are pretextual. *Berry*, 84 F.4th at 1313 (Where an employer provides a legitimate, nondiscriminatory reason for its adverse action, "the employee *needs* to rebut that explanation."); *see also id.* at 1314 (Abudu, J., concurring) ("[A]lthough this Circuit treats the pretext analysis under the convincing mosaic approach and the pretext analysis embedded within the *McDonnell Douglas* framework as alternatives, they are—in effect—one and the same."); *Ossmann*, 82 F.4th at 1020 ("[T]he convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough evidence for a reasonable jury to infer intentional discrimination.").

Finally, even if Washington had successfully navigated *McDonnell Douglas* or the convincing mosaic framework, his discrimination claims nonetheless fail. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941-42 (11th Cir. 2023) ("[T]he ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination. The prima facie case in the *McDonnell Douglas* framework can help answer that question—but it cannot replace it."). Given Washington's serial, undisputed violations of GEICO's call handling policies, no reasonable jury could find on these facts that race played any role in Washington's termination. Thus, the answer to the "ultimate question" here is that there simply is no evidence suggesting illegal discrimination. Accordingly, summary judgment on Washington's Title VII and § 1981 discrimination claims is appropriate.

**B. Title VII Retaliation Claim**

To establish a prima facie case of retaliation, the "plaintiff must show (1) that [he] engaged in statutorily protected activity, (2) that an adverse employment action

occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities." *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). GEICO does not dispute that Washington engaged in protected activity or that he suffered an adverse action.[17]  Doc. 15 at 17-18 & 17-18 n.6. Rather, GEICO contends that Washington has failed to demonstrate a causal connection or pretext. *Id*. The Court agrees.

Washington's retaliation claim ultimately hinges on his assertion that there is evidence of a "direct casual connection" between his protected activity and his termination because Lower "was responsible for the reports that got Washington fired." Doc. 20 at 13-14. But there is no evidence supporting Washington's contention that Lower was involved in his termination. Rather, the undisputed evidence shows Crawford independently investigated Washington's misconduct before concluding that Washington violated GEICO's call handling policies and that termination was appropriate. Thus, Washington fails to establish a causal connection between his complaints against Lower and his termination.

But even assuming Washington could establish a prima facie case of retaliation, Washington has made no effort to demonstrate that GEICO's legitimate nonretaliatory reasons for terminating his employment were pretextual. As discussed previously, GEICO claims it terminated Washington because of his violations of GEICO's call

---

[17] Washington claims that his complaints "in November 2019, March 2020, and January 2021" constitute protected activity. Doc. 1 ¶ 100. GEICO agrees that the November 2019 complaint against Lower where Washington claimed he was "being singled out, targeted, racially harassed, and put in a hostile work environment," constituted protected activity. Docs. 15 at 17-18 n.6; 15-1 ¶ 8; 15-4 at 3-4; 20-1 ¶ 8; 21-1 ¶ 8. However, GEICO contends that the March 2020 statement to Ibarra and January 2021 statement to Crawford do not "constitute protected activity because Washington never referenced discrimination or unfair treatment on the basis of his race." Doc. 15 at 17-18 n.6. Ultimately, it is not necessary to address this argument because Washington fails to provide evidence of a causal connection between any of his complaints against Lower and his termination or pretext.

handling policies.  Doc. 15 at 19.  It is not in the Court's discretion to quarrel with the wisdom of GEICO's reasons for its decision, as long as the reasons are not a cover for retaliation.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000); *Alvarez*, 610 F.3d at 1266.  Washington has presented no evidence to contradict GEICO's proffered reasons and, thus, he fails to demonstrate pretext.

In sum, Washington has failed to establish a prima facie case of retaliation, he has failed to establish that GEICO's nonretaliatory reasons are pretextual, and even if he had successfully navigated *McDonnell Douglas* or the convincing mosaic framework, Washington has not come forward with enough evidence for a reasonable factfinder to infer unlawful retaliation.  Accordingly, summary judgment on Washington's Title VII retaliation claim is appropriate.

## IV.  CONCLUSION

For the reasons stated, GEICO's motion for summary judgment (Doc. 15) is **GRANTED**.

**SO ORDERED**, this 17th day of July, 2024.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT